UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| YAHYA (JOHN) LINDH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:14-cv-00142-JMS-DKL |
| | ) | |
| WARDEN, FEDERAL CORRECTIONAL | ) | |
| INSTITUTION, TERRE HAUTE, INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff Yahya (John) Lindh and Defendant Warden, Federal Correctional Institution, Terre Haute, Indiana (the "Warden"). [Filing No. 56; Filing No. 68.] In the operative complaint, Mr. Lindh challenges the Warden's policy that as an inmate in the Communications Management Housing Unit of the Terre Haute Federal Correctional Institution, he must undergo a visual strip search of all body surfaces and body cavities before a non-contact visit where he is located in a separate room from his visitors. [Filing No. 42.] He argues that this policy violates his rights under the Religious Freedom Restoration Act ("RFRA") and is unreasonable in violation of the Fourth Amendment to the United States Constitution.[1] [Filing No. 42 at 6.] For the reasons that follow, the Court grants summary judgment in favor of the Warden on Mr. Lindh's Fourth Amendment claim and grants summary judgment in favor of Mr. Lindh on his RFRA claim.

---

[1] Because Mr. Lindh concedes that his Fourth Amendment challenge fails under precedent that binds this Court, the Court grants summary judgment in favor of the Warden on Mr. Lindh's Fourth Amendment claim. [Filing No. 42 at 6 (citing *King v. McCarty*, 781 F.3d 889 (7th Cir. 2015); Filing No. 57 at 19-21 (same).]

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648. Put another way, cross-motions for summary judgment do not waive the right to a trial and, instead, are treated separately. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 (7th Cir. 2008).

## II.
### RELEVANT BACKGROUND

The parties do not dispute the vast majority of material facts at issue in this litigation. [Filing No. 57 at 2-11; Filing No. 70 at 2-4.]  Thus, the following facts are undisputed, unless otherwise noted.

### A.  The CMU

A Communications Management Housing Unit ("CMU") "is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU."  28 C.F.R. § 540.200(b); [*see also* Filing No. 42 at 3; Filing No. 47 at 2].  "The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community."  28 C.F.R. § 540.200(c).  "The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public."  28 C.F.R. § 540.200(c).

The CMU located in Terre Haute opened in 2006.[2]  [Filing No. 42 at 2-3; Filing No. 47 at 2.]  It contains 56 cells that can each house two inmates.  [Filing No. 42 at 3; Filing No. 47 at 2; Filing No. 56-1 at 4.]  As of May 2015, the CMU had 47 total inmates, all of whom were male. Filing No. 56-1 at 4.]  The CMU is not a special housing unit, although it does contain six cells reserved for special housing.  [Filing No. 42 at 3; Filing No. 47 at 2; Filing No. 56-1 at 4; Filing No. 56-1 at 8.]

---

[2] There is another CMU located in Marion, Illinois, and its inmates are also subject to visual strip searches before non-contact visits.  [Filing No. 56-1 at 10.]  All references to the CMU from this point forward refer to the CMU in Terre Haute, unless otherwise specified.

4

Aside from attorney visits, law enforcement interviews, or other extraordinary circumstances, visits at the CMU are "non-contact with no physical contact possible between visitors and prisoners." [Filing No. 42 at 3; Filing No. 47 at 2.] These visits are also referred to as "social visits," and they take place on Saturday, Sunday, or Monday, unless authorized in advance for another day. [Filing No. 56-1 at 4.] An inmate may have up to two non-contact visits per month for four hours. [Filing No. 56-1 at 4.] Only one non-contact visit may occur at a time. [Filing No. 56-1 at 5.]

Non-contact visits occur in two rooms separated from each other by a plexiglass window and separated from the regular access area of the CMU by a locked door.[3] [Filing No. 42 at 3; Filing No. 47 at 2.] The visits take place through the plexiglass window with the parties conversing by phone. [Filing No. 42 at 3; Filing No. 47 at 3.] One custodial officer remains immediately outside the visiting rooms at a desk with a phone. [Filing No. 42 at 3; Filing No. 47 at 3; Filing No. 56-1 at 5-6; Filing No. 56-1 at 14.] The doors on the visiting rooms are plexiglass, so the officer can see into them. [Filing No. 56-1 at 5-6.] The officer "observes the visit periodically" through the plexiglass door. [Filing No. 56-1 at 6.] There is a video camera present in the visiting room space and audio monitoring of the conversation through the phone that the inmate and visitor use. [Filing No. 42 at 4; Filing No. 47 at 3.] The audio and video feed are monitored offsite and also recorded. [Filing No. 56-1 at 6.]

Until the end of October 2012, CMU inmates who had non-contact social visits were not given a visual strip search. [Filing No. 42 at 5; Filing No. 47 at 3.] They were, however, "under

---

[3] Plexiglas® is a registered brand name, but the parties generically refer to the clear separator between the CMU visitation rooms as "plexiglass." The Court will defer to the parties' spelling of the term.

constant observation during the visits." [Filing No. 42 at 5; Filing No. 47 at 3.]  Currently, CMU inmates who have a non-contact social visit are subject to a visual strip search before the visit. [Filing No. 42 at 5; Filing No. 47 at 3.]  The inmate is asked to remove his clothing and the officer inspects his body, ears, hands, feet, back of his neck, inside of his mouth, and inside of his nose. [Filing No. 56-1 at 7.]  The inmate also must run his fingers through his hair, bend over, and squat so that the officer can look at his anal area.  [Filing No. 56-1 at 7.]  He also must lift his genitals so that area is visible to the officer.  [Filing No. 56-1 at 7.]  Visual strip searches occur in the bathroom next to the room where the inmates are located during the visits.  [Filing No. 42 at 5; Filing No. 47 at 3.]  A correctional officer of the same sex as the inmate conducts the visual strip search.  [Filing No. 56-1 at 8.]  The inmate may not take anything into the visiting room other than a comb, a religious medallion, a handkerchief, and a wedding ring.  [Filing No. 56-1 at 11.]  The inmate is instructed to remain seated during the visit.  [Filing No. 56-1 at 15.]

The Warden has identified a few security-related incidents that led to the implementation of the visual strip search policy before non-contact visits at the CMU.[4]  For example, a CMU inmate was once able "to conceal a photograph on his person and hold it in such a way that his visitors could see it but observing staff could not."  [Filing No. 69-1 at 6.]  Another CMU inmate "attempted to bring a written message into a legal visit for another inmate [and t]he note was discovered in the inmate's clothes after the inmate had removed them."  [Filing No. 69-6 at 3.]  Another CMU inmate attempted to take messages out to the recreation cells and was discovered to have messages hidden in his underwear that were not discovered during a pat search and did not become dislodged from his underwear even when the inmate was jostling around to remove it.

---

[4] While Mr. Lindh questions whether any security procedures were utilized before some of these incidents occurred, [*see, e.g.*, Filing No. 75 at 6-8], he does not dispute that they happened or led to the implementation of the visual strip search policy at issue.

[Filing No. 69-3 at 6-7; Filing No. 69-4 at 2-3.] Another CMU inmate's visitor once manipulated her body to block the view of the inmate's activity, and it was later discovered upon terminating the visit that the visitor had exposed her breasts to the inmate while the inmate exposed his genitals. [Filing No. 69-6 at 2.] Finally, the Warden identifies a general concern that an inmate could write a message on his body and avoid detection of the message without a visual strip search, but he does not detail any instances where that actually happened. [Filing No. 69-1 at 5.]

### B.  Mr. Lindh

Mr. Lindh was convicted of Supplying Services to the Taliban and Carrying an Explosive During the Commission of a Felony Which May Be Prosecuted in the United States.  [Filing No. 69-7 at 5.] He is an inmate at the Terre Haute CMU and has been incarcerated there since October 2007.  [Filing No. 42 at 1; Filing No. 47 at 1; Filing No. 56-2 at 1.] Mr. Lindh did not challenge his original designation to a CMU and has not challenged the continuation of that designation following subsequent reviews.  [Filing No. 69-7 at 5.] Mr. Lindh has had non-contact social visits at the CMU.[5]  [Filing No. 56-2 at 2.]  He has seen the video camera pointing toward where the inmate sits during social visits from the visitor's side of the plexiglass separator.  [Filing No. 56-2

---

[5] Mr. Lindh filed an affidavit in support of his summary judgment motion. [Filing No. 56-2.] The Warden challenges the admissibility of eight of its thirty paragraphs, arguing that they "contain opinions, conjecture, speculation, or beliefs that are otherwise unsupported by admissible evidence, [and] are without proper foundation." [Filing No. 70 at 6.] Other than identifying the paragraph numbers of the challenged portions of Mr. Lindh's affidavit and citing general caselaw, the Warden does not meaningfully develop his argument. [Filing No. 70 at 5-6.] The Court concludes that the Warden has waived this argument. *See Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1006 (7th Cir. 2008) (cursory arguments are waived). Waiver notwithstanding, in response to the Warden's challenge, Mr. Lindh provides a detailed analysis of the admissibility of each paragraph. [Filing No. 75 at 2-5.] As Mr. Lindh points out, the portions of his affidavit at issue attest to his own experiences in the visitation room at the CMU and other facilities, his opinions based on those experiences, and alternatives to the visual strip search that he would be willing to accept. [Filing No. 75 at 2-5.] Perhaps tellingly, the Warden ignores Mr. Lindh's detailed response arguments in his reply brief. [Filing No. 78.] For all of these reasons, the Court rejects the Warden's challenge to the admissibility of portions of Mr. Lindh's affidavit.

at 2.]  Mr. Lindh is aware that his conversations over the telephone with any visitor are monitored and recorded.  [Filing No. 56-2 at 2-3.]  The only social visits that Mr. Lindh has had while housed at the CMU have been with family members.  [Filing No. 56-2 at 1.]

From the time Mr. Lindh arrived at the CMU until fall 2012, CMU inmates who had social visits were given "at most only a pat-down search."  [Filing No. 56-2 at 2.]  In fall 2012, a new policy was implemented and "CMU prisoners who had social visits were subject to [visual] strip searches both before and after all social visits."  [Filing No. 56-2 at 2.]  Mr. Lindh noticed that at some point that policy changed "so that now we are required to have a strip search before all of our social visits, but not after."  [Filing No. 56-2 at 2.]  During a visual strip search, Mr. Lindh is required to take off his clothes while he is observed by a correctional officer.  [Filing No. 56-2 at 2.]  The correctional officer searches his clothes separately from visually searching him.  [Filing No. 56-2 at 2.]

Mr. Lindh is a practicing Muslim.  [Filing No. 42 at 5; Filing No. 47 at 3; Filing No. 56-2 at 4.]  Pursuant to his religious beliefs, "a male person is prohibited from exposing the area of his body between the navel and the knees.  This area is called the *awrah*."  [Filing No. 56-2 at 4.]  Exceptions to this prohibition exist for showing the *awrah* to one's spouse, for medical treatment, or for other circumstances of necessity.  [Filing No. 56-2 at 4.]  Islam "recognizes that if a Muslim is compelled by force or some other human behavior to violate certain religious principles and requirements then the Muslim person being so forced is absolved of sin because he acts under compulsion."  [Filing No. 56-2 at 4.]  Mr. Lindh emphasizes, however, that "Islam also teaches that if a Muslim can challenge the compulsion he must do so for Islam requires that if somebody encounters something that is wrong and the person has the ability to seek to change it he or she must do so."  [Filing No. 56-2 at 5.]

The Warden presents no evidence that Mr. Lindh has attempted to communicate any concealed messages to members of the public while housed in the CMU, either inside or outside of a non-contact visit.

Mr. Lindh filed an administrative grievance regarding the visual strip search policy, but it was denied.  [Filing No. 42-1.]

**C.  Procedural History**

In May 2014, Mr. Lindh filed a Complaint against the Warden in this Court.  [Filing No. 1.]  The operative complaint alleges that the Warden's policy of subjecting Mr. Lindh to visual strip searches before non-contact visits violates his rights under RFRA.  [Filing No. 42 at 6 (citing 42 U.S.C. § 2000bb-1).]  Mr. Lindh alleges that the Warden's policy "imposes a substantial burden on plaintiff's religious exercise and neither furthers a compelling governmental interest, nor is it the least restrictive alternative to further that interest."  [Filing No. 42 at 6.]  Mr. Lindh requests permanent injunctive relief enjoining the Warden from conducting visual strip searches of him when he has non-contact visits.  [Filing No. 42 at 7.]

Mr. Lindh filed a Motion for Summary Judgment in favor of his claim, [Filing No. 56], and the Warden filed a Cross-Motion for Summary Judgment in response, [Filing No. 68].  Those motions are now fully briefed and ripe for this Court's consideration.

### III.
### DISCUSSION

The Court will begin by setting forth the generally applicable law before turning to the merits of the parties' arguments regarding Mr. Lindh's RFRA claim.

## A. RFRA[6]

Congress enacted RFRA and its sister statute, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), "'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014)).  RFRA applies to the federal government and its agencies.[7]  *Hobby Lobby*, 134 S. Ct. at 2761.  It provides that the "'[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability,' unless the government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'"  *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. §§ 2000bb-1(a), (b)).  Determining the compelling-interest and least-restrictive-means are questions of law.  *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008) (following precedent of all Circuits to consider question).

RFRA was enacted in response to a decision by the United States Supreme Court holding that neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment.  *Holt*, 135 S. Ct. at 859 (citing

---

[6] The Court expresses its disappointment with the Warden's failure to acknowledge *Holt v. Hobbs*, 135 S. Ct. 853 (2015)—the most recent United States Supreme Court case that is directly on point.  Mr. Lindh cited *Holt* throughout his opening brief, [Filing No. 57], but the Warden did not cite or attempt to distinguish *Holt* in either of his summary judgment briefs, [Filing No. 68; Filing No. 78.]  Ignoring key precedent is not effective advocacy under any circumstance.  The Court expects more from the Warden and counsel, both of whom are employed by the United States Department of Justice.

[7] Congress also intended for RFRA to apply to the States, but the Supreme Court later held that RFRA exceeded Congress' power to the extent that it was applicable to the States and their subdivisions through Section 5 of the Fourteenth Amendment.  *Holt*, 135 S. Ct. at 860 (citing *City of Boerne v. Flores*, 521 U.S. 507 (1997)).  In response, Congress enacted RLUIPA, which "applies to the States and their subdivisions and invokes congressional authority under the Spending and Commerce Clauses."  *Holt*, 135 S. Ct. at 860 (citing 42 U.S.C. § 2000cc-1(b)).

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)).  Specifically, "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S. Ct. at 859-60.  As the Supreme Court recently recognized, "[b]y enacting RFRA, Congress went far beyond what [the Supreme Court] has held is constitutionally required." *Hobby Lobby*, 134 S. Ct. at 2767.  It is "the obligation of the courts to consider whether exceptions are required under the test set forth by Congress." *Holt*, 135 S. Ct. at 864.

RFRA and RLUIPA "are substantively identical with respect to prisoners' entitlements." *Whitfield v. Illinois Dep't of Corr.*, 237 F. App'x 93, 94 (7th Cir. 2007).  Both statutes define "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Hobby Lobby*, 134 S. Ct. 2751 (citing 42 U.S.C. § 2000cc-5(7)(A)).  As the Supreme Court has recognized, "Congress mandated that this concept 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Hobby Lobby*, 134 S. Ct. 2751 (citing 42 U.S.C. § 2000cc-3(g)).

When seeking an accommodation from a prison policy under RFRA, the plaintiff bears the initial burden of proving that the defendant's challenged policy implicates the plaintiff's religious exercise. *Holt*, 135 S. Ct. at 862.  The plaintiff's request for an accommodation "must be sincerely based on a religious belief and not some other motivation." *Id.* at 862; *see also Hobby Lobby*, 134 S. Ct. 2751 ("[t]o qualify for RFRA's protection, an asserted belief must be 'sincere'").  Additionally, the plaintiff bears the burden of proving that the challenged policy "substantially burden[s] that exercise of religion." *Holt*, 135 S. Ct. at 862.  He can do so by showing that the

challenged policy requires him to "engage in conduct that seriously violates [his] religious beliefs." *Id.* (citing *Hobby Lobby*, 134 S. Ct. at 2775).

If the plaintiff meets his burden of showing that the challenged policy substantially burdens his exercise of religion, the burden then shifts to the defendant to show that its refusal to allow him an accommodation was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest. *Holt*, 135 S. Ct. at 863 (citing 42 U.S.C. § 2000cc-1(a)). RFRA contemplates a "'more focused inquiry'" than just a compelling interest in prison safety and security, requiring the defendant "to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. 863 (quoting *Hobby Lobby*, 134 S. Ct. at 2779). Put another way, it requires the Court to "'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'" and "'to look to the marginal interest in enforcing'" the challenged government action in that particular context. *Holt*, 135 S. Ct. 863 (quoting *Hobby Lobby*, 134 S. Ct. at 2779).

The Court is not "bound to defer" to a defendant's assertion regarding what would undermine its compelling interest because RFRA "does not permit such unquestioning deference." *Holt*, 135 S. Ct. at 863-64. Instead, the "test requires the [defendant] not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest." *Id.* "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Id.* (quoting *Hobby Lobby*, 134 S. Ct. at 2780). "'[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'" *Holt*, 135 S.

Ct. at 853 (quoting *Hobby Lobby*, 134 S. Ct. at 2780). While cost "may be an important factor in the least-restrictive-means analysis," RFRA "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 134 S. Ct. at 2781.

### B.  Mr. Lindh's RFRA Claim

In his motion for summary judgment, Mr. Lindh argues that requiring him to completely undress to be visually searched as a condition of having a non-contact visit substantially burdens his religious exercise because it requires him to expose the area of his body called the *awrah*. [Filing No. 57 at 13-14.] Mr. Lindh contends that the Warden cannot sustain his burden of showing that the policy is justified by a compelling governmental interest and, even if he can, the visual strip search requirement is not the least restrictive means of advancing that interest as applied to Mr. Lindh.  [Filing No. 57 at 15-19.]  Thus, Mr. Lindh asks this Court to enter summary judgment in his favor on his RFRA claim and to enjoin the Warden from enforcing the policy at issue as applied to him.  [Filing No. 57 at 21.]

In response, the Warden opposes Mr. Lindh's motion and asks the Court to enter summary judgment in his favor on Mr. Lindh's RFRA claim.  [Filing No. 70.]  The Warden does not contest that Mr. Lindh has a sincerely held religious belief that he should not expose the portion of his body constituting the *awrah* or that the visual strip search policy before a non-contact visit requires him to do so.  [Filing No. 70 at 8.]  The Warden instead argues that Mr. Lindh's religious exercise is not substantially burdened because Mr. Lindh admits that his religion absolves him of the sin associated with exposing the *awrah* if such exposure is necessary.  [Filing No. 70 at 8-9.] Additionally, the Warden maintains that even if the policy is a substantial burden, that burden is justified by the Warden's compelling interest of safety and security. [Filing No. 70 at 10-17.]  The

Warden emphasizes the communications monitoring purpose of the CMU, pointing out that Mr. Lindh never has challenged his designation to the CMU.  [Filing No. 70 at 11-14.]  The Warden concludes that the no-exception visual strip search policy is the least restrictive means of accomplishing the compelling governmental interest at issue because it is the only security measure that could detect messages written on an inmate's body.  [Filing No. 70 at 18-19.]  The Warden details various incidents that it claims support that conclusion and rejects the adequacy of Mr. Lindh's proposed alternatives.  [Filing No. 70 at 19-26.]

In reply in support of his motion and in response to the Warden's motion, Mr. Lindh argues that there are no material facts in dispute and emphasizes that whether a policy constitutes the least restrictive means is a legal conclusion for the Court.  [Filing No. 75 at 7-8.]  Mr. Lindh contends that the Warden's visual strip search policy imposes a substantial burden on his religious beliefs because it requires him to engage in conduct that seriously violates those beliefs, and to conclude otherwise would "eviscerate the protections of RFRA."  [Filing No. 75 at 9-10.]  Mr. Lindh argues that the Warden has not established that the visual strip search policy is supported by a compelling governmental interest, claiming that the cited examples are insufficient to meet the Warden's burden regarding the compelling interest.  [Filing No. 75 at 11.]  Mr. Lindh emphasizes that he is not challenging the visual strip search policy on its face and that the Warden does not tailor his arguments to Mr. Lindh and his request, as required by RFRA.  [Filing No. 75 at 11-12.]  Mr. Lindh concludes that the Warden has not met his burden to show that the visual strip search policy is the least restrictive means of achieving any compelling governmental interest, emphasizing that the Warden never considered alternatives for Mr. Lindh.  [Filing No. 75 at 14-16.]

In his reply brief supporting his summary judgment request, the Warden challenges Mr. Lindh's assertion that visually strip searching inmates before a non-contact visit does not respond

to a problem in need of solving, again emphasizing incidents he contends support the policy. [Filing No. 78 at 1-2.] The Warden claims that Mr. Lindh's proposed alternatives are not workable and could present an increased risk to Mr. Lindh's safety and welfare. [Filing No. 78 at 2-3.] The Warden also points out that Mr. Lindh has not put forth any evidence that the Warden possesses restraints designed to safely bind him to a chair and, if it does, Mr. Lindh would then not be able to use the telephone required for the non-contact visit. [Filing No. 78 at 3-4.] The Warden also points out that Mr. Lindh's safety could be compromised if he is chained to a chair and a fire or other disaster occurred. [Filing No. 78 at 4.] For these reasons, the Warden concludes that the visual strip search policy before non-contact visits is the least restrictive means of furthering the compelling government interest at issue. [Filing No. 78 at 4.]

Because the Warden attached new evidence to his reply brief, Mr. Lindh filed a surreply brief. [Filing No. 79 at 1.] Mr. Lindh points out that the Warden "now appears to concede that his interest is not simply in preventing illegal non-auditory communications but in preventing illegal non-auditory communications *that are not detected by prison staff*—for an inmate unconcerned about detection may simply convey messages to visitors orally." [Filing No. 79 at 2 (original emphasis).] Mr. Lindh again emphasizes that he is only challenging the visual strip search policy as applied to him before a non-contact visit, arguing that the Warden has not shown that Mr. Lindh is likely to attempt to convey illegal messages to social visitors through writing on the area of his body covered by his shorts. [Filing No. 79 at 2.] Finally, Mr. Lindh reminds the Warden that it is his burden to show that less restrictive means are not available, contending that to the extent the Warden attempts to do so, he has fallen short. [Filing No. 79 at 4-5.]

15

1) *Mr. Lindh's Burden*

It is Mr. Lindh's burden to show that the Warden's policy of visually strip searching him before a non-contact visit substantially burdens his exercise of religion under RFRA.[8]  *See Holt*, 135 S. Ct. at 862.  In support of his position that Mr. Lindh has not shown a substantial burden, the Warden emphasizes an admission in Mr. Lindh's affidavit that his religion absolves him of sin if he acts under compulsion or other circumstances of necessity.  [Filing No. 70 at 8-9 (citing Filing No. 56-2 at 4).]  The Warden claims that because the visual strip search policy at issue "is imposed upon [Mr. Lindh] by the prison rules, there is no condemnation on [Mr. Lindh] and, while it frustrates his religious belief, it is not a substantial burden on his religious exercise."  [Filing No. 70 at 9.]

The United States Supreme Court rejected a similar argument in *Holt*.  In that case, a Muslim inmate sought to grow a ½-inch beard in accordance with his religious beliefs, but growing a beard would violate the prison's no-beard policy.  *Holt*, 135 S. Ct. at 859.  The Supreme Court—which ultimately entered judgment in favor of the inmate on his RLUIPA claim—found that the inmate had "easily satisfied" his obligation to show that the grooming policy substantially burdened his exercise of religion, despite the defendant suggesting that any burden was slight "because, according to [the inmate's] testimony, his religion would 'credit' him for attempting to follow his religious beliefs, even if that attempt proved unsuccessful."  *Id.* at 862.  The Supreme Court rejected that argument, holding that because the policy made the inmate choose between following it or following his religion, "it substantially burdens his religious exercise."  *Id.*; *see also Hobby Lobby*, 134 S. Ct. at 2779 (emphasizing that it is not for the Court to determine whether a

---

[8] It is also Mr. Lindh's burden to show that his request for an accommodation is based on a sincerely held religious belief, *Holt*, 135 S. Ct. at 862, but the Warden does not dispute that point, [Filing No. 70 at 8].

plaintiff has properly concluded that the challenged regulation "lies on the forbidden side of the line" or to "say that their religious beliefs are mistaken or insubstantial[; i]nstead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction") (citation omitted).

The Warden's policy forces Mr. Lindh to choose between undergoing a visual strip search so that he can engage in a non-contact visit—which the Warden does not dispute violates Mr. Lindh's sincerely held religious beliefs—or refusing the visual strip search and foregoing the non-contact visit.  Making him choose between these options substantially burdens his religious exercise.  The Court agrees with Mr. Lindh that reaching the opposite conclusion under these circumstances would make RFRA's protections illusory.  [Filing No. 75 at 10.]  Concluding that a defendant could show that a policy did not substantially burden a plaintiff's religious exercise because his religion absolved him of sin incurred out of necessity or compulsion would be at odds with the "very broad protection for religious liberty" that Congress sought to provide by enacting RFRA. *Hobby Lobby*, 134 S. Ct. at 2760.  Thus, the Court concludes that it beyond dispute that Mr. Lindh has met his burden to show that the Warden's visual strip search policy imposes a substantial burden on his religious exercise.

### 2) The Warden's Burden

The burden now shifts to the Warden to show that his refusal to allow Mr. Lindh an accommodation was in furtherance of a compelling governmental interest and was the least restrictive means of furthering that compelling governmental interest. *Holt*, 135 S. Ct. at 853; *see also Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015) ("The Court stressed in *Holt* that the prison system has the burdens of production and persuasion on the compelling-interest and least-restrictive-means defenses.").

17

a.  Compelling Governmental Interest[9]

The parties dispute whether the visual strip search policy is in furtherance of a compelling governmental interest.  The Warden claims that it furthers a compelling governmental interest in safety and security because the visual strip search policy completely prevents inmates from conveying messages during non-contact visits.  [Filing No. 70 at 10-17.]  The Warden emphasizes the communications monitoring mission of the CMU and the deference he believes the Court should give him to determine the appropriate security protocol.  [Filing No. 70 at 11-17.]  In response, Mr. Lindh "concedes that the need to provide for security in the prison setting is a compelling interest."  [Filing No. 75 at 10.]  But he opposes the Warden's legal conclusion that the visual strip search policy furthers a compelling governmental interest by arguing that the standard "demands more than an abstract articulation of interest."  [Filing No. 75 at 11.]  He also emphasizes that the Warden fails to demonstrate how the compelling-interest test is satisfied through application of the challenged policy with regard to Mr. Lindh.  [Filing No. 75 at 11-12.]

The Supreme Court's decision in *Holt* guides the Court's analysis of the parties' compelling-interest arguments.  The defendant in *Holt* also identified the prison's interest in safety and security as its compelling governmental interest for not allowing the Muslim inmate in that case to grown a ½-inch beard.  135 S. Ct. at 863.  While the Supreme Court "readily agree[d]" that the prison had a compelling interest in stopping the flow of contraband within its facilities, it found the defendant's argument that this interest would be compromised by allowing an inmate to grow a ½-inch beard "hard to take seriously" because the challenged policy did not further the interest at issue.  *Id.* at 863; *see also* 42 U.S.C. § 2000cc-1(a) (defendant's burden to show that policy is

_____

[9] Some of the parties' arguments regarding the compelling-interest and least-restrictive-means analyses overlap.  The Court will address the parties' arguments in the section it deems most applicable.

18

"*in furtherance of* a compelling governmental interest") (emphasis added).  The Supreme Court emphasized that RFRA "does not permit such unquestioning deference" to the defendant's "assertion that allowing petitioner to grow such a beard would undermine its interest in suppressing contraband." *Holt*, 135 S. Ct. at 864.  Instead, RFRA "makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress." *Id.* (citing *Gonzales v. O Centro Espírita Beneficente Unio do Vegetal*, 546 U.S. 418, 434 (2006)).  The Supreme Court concluded that "without a degree of deference that is tantamount to unquestioning acceptance, it is hard to swallow the argument that denying petitioner a ½-inch beard actually furthers the Department's interest in rooting out contraband." *Holt*, 135 S. Ct. at 864.  The Supreme Court also pointed out that the compelling interest test "contemplates a 'more focused' inquiry and 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *Id.* at 863 (quoting *Hobby Lobby*, 134 S. Ct. at 2779).

Mr. Lindh does not dispute the Warden's contention that safety and security constitute a compelling governmental interest.  [Filing No. 75 at 10 ("Mr. Lindh, of course, concedes that the need to provide for security in the prison setting is a compelling interest.").]  But that alone does not satisfy the Warden's burden with regard to the compelling-interest test.  As *Holt* teaches, the Warden must also show that the challenged policy "actually furthers" the compelling governmental interest at issue.  135 S. Ct. at 863-64.  While the Court gives some deference to the Warden's expertise and experience running a prison, RFRA demands that the Court not blindly accept the Warden's conclusions regarding what measures are necessary to actually further the identified compelling interest.  *Id.* at 864.

19

This case is a closer call than *Holt* with regard to whether the challenged policy "actually furthers" the identified compelling governmental interest. After considering the parties' arguments, the Court agrees with the Warden that a visual strip search before a non-contact visit does actually further the identified compelling interest, particularly because of the communications management mission of the CMU.[10]  *See* 28 C.F.R. § 540.200(c) ("The purpose of CMUs is to provide an inmate housing unit environment that enables staff to more effectively monitor communication between inmates in CMUs and persons in the community. . . . The ability to monitor such communication is necessary to ensure the safety, security, and orderly operation of correctional facilities, and protection of the public."). As the Warden points out, without a visual strip search, an inmate could write a message directly on his body and then quickly show it to a visitor during the visit. [Filing No. 69-1 at 6.]  Additionally, according to the Warden, "[c]ontraband, including written messages on paper, are often hidden in clothing and underwear to avoid discovery by pat searches" and these items can be "positioned so that even jostling of the inmate and his clothes do not dislodge the hidden messages."[11]  [Filing No. 69-3 at 6.]  Finally, as the Warden emphasizes, the visual strip search policy is aimed at preventing the disclosure of hidden messages by identifying them before such disclosure, while the other security measures such as video recording, audio recording, and the guard stationed outside the visiting room "merely

---

[10] Given the unique communications monitoring purpose of the CMU, the Court does not find Mr. Lindh's arguments regarding the lack of visual strip searches before non-contact visits at non-CMU facilities persuasive.  [*See, e.g.*, Filing No. 75 at 11.]

[11] For example, the Warden attests to an incident shortly before the visual strip search policy was implemented where a CMU inmate "was able to conceal a photograph on his person and hold it in such a way that his visitors could see it but observing staff could not."  [Filing No. 69-1 at 6.]  As Mr. Lindh points out, it is unclear whether that inmate underwent any sort of search before that visit, given that the Warden does not dispute that before the current visual strip search policy, "CMU prisoners were subjected to at most a pat-down search prior to visits and sometimes that did not even occur."  [Filing No. 75 at 6 (citing Filing No. 56-2 at 2).]  There is also no evidence that the photograph depicted sensitive information that presented a security risk.

20

document breaches which have already occurred." [Filing No. 69-3 at 6.] For these reasons, particularly in light of the communications monitoring mission of the CMU, the Court concludes that the Warden has identified a compelling governmental interest that the visual strip search policy at issue actually furthers—namely, the interest in preventing the disclosure of hidden messages from CMU inmates to members of the public during a non-contact social visit.

This is not the end of the compelling-interest inquiry, however. As Mr. Lindh points out, [Filing No. 75 at 11-12], the Warden fails to cite any evidence demonstrating that the compelling-interest test is satisfied through application of the challenged policy to Mr. Lindh as "the particular claimant whose sincere exercise of religion is being substantially burdened," *see Holt*, 135 S. Ct. at 863 (holding that the compelling interest test "contemplates a 'more focused' inquiry and 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened'") (quoting *Hobby Lobby*, 134 S. Ct. at 2779). The Warden does not dispute that the only non-contact social visits Mr. Lindh has had while housed in the CMU have been with his family. [Filing No. 56-2 at 1; Filing No. 70 at 13.] The Warden also does not provide any evidence that Mr. Lindh has violated or attempted to violate any communications-related policies while housed in the CMU or during a non-contact social visit or that Mr. Lindh's family members present any type of security risk.

The Warden's only argument with regard to Mr. Lindh is that "[t]o allow the Plaintiff to be the only inmate exempted from a visual strip search prior to a visit would pose a serious threat to the inmate, as well as the safe, secure orderly running of the institution and the public at large." [Filing No. 70 at 12.] Given that only one non-contact social visit can occur at a time, it is possible that the other CMU inmates would not be aware of Mr. Lindh's exemption from the visual strip

search requirement before such visits.  Even if they did find out, however, Mr. Lindh's exception would be less obvious than the visible beard the inmate in *Holt* was allowed to grow, and the Supreme Court rejected a similar exception argument in that case.  *See Holt*, 135 S. Ct. at 866 ("At bottom, this argument is but another formulation of the classic rejoinder of bureaucrats throughout history:  If I make an exception for you, I'll have to make one for everybody, so no exceptions. We have rejected a similar argument in analogous contexts, and we reject it again today.") (citations omitted).  Moreover, as Mr. Lindh points out, he is willing to undergo substitute security measures instead of the visual strip search, such as removing all of his clothing so it can be searched except for his underwear shorts, being chained to a chair, and being handcuffed during the non-contact visit.  [Filing No. 75 at 13.]  The Warden has cited no caselaw supporting his apparent position that Mr. Lindh's sincerely held religious beliefs—which RFRA broadly seeks to protect—can be dismissed simply because the Warden does not want to make him an exception to a generally applicable rule.

For these reasons, the Court concludes that although the Warden has identified a compelling governmental interest that is actually furthered by the challenged policy, he has failed to meet his burden to demonstrating that the compelling-interest test is satisfied through application of the challenged policy as to Mr. Lindh.  *Holt*, 135 S. Ct. at 863.  Accordingly, the Court must enter summary judgment in favor of Mr. Lindh on his RFRA claim.

b.  Least Restrictive Means

Even if the Warden had met his burden pursuant to the compelling-interest test, he would then face the "'exceptionally demanding'" least-restrictive-means standard.  *Holt*, 135 S. Ct. at 864 (quoting *Hobby Lobby*, 134 S. Ct. at 2780).  This standard "requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the

22

exercise of religion by the objecting part[y].   [I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.'"   *Holt*, 135 S. Ct. at 864 (quoting *Hobby Lobby*, 134 S. Ct. at 2780) (citation omitted).

Mr. Lindh concedes that "he can be required to remove all his clothing, with the exception of his shorts," before a non-contact social visit. [Filing No. 75 at 6.]  Moreover, Mr. Lindh "is not proposing that nothing replace the strip search to address the Warden's security concerns." [Filing No. 75 at 13.]  Although Mr. Lindh would prefer to go to the non-contact visits "with only a pat-down search," he is willing to accept other restrictions in lieu of a visual strip search, including either being "placed in hand and/or leg restrains during the visits" or removing his clothing "down to his BOP-purchased shorts, covering the area between [his] navel and knee" and, if necessary, jumping up and down while in the shorts to demonstrate that he is not hiding anything in the area covered by the shorts.  [Filing No. 56-2 at 5.]

The Warden did not consider or propose any alternatives to the visual strip search from which Mr. Lindh requests to be exempted.[12]   [Filing No. 56-2 at 5.]  While the Warden argues that Mr. Lindh's proffered alternatives are insufficient, the Supreme Court has held that "[c]ourts must hold prisons to their statutory burden, and they must not assume that plausible, less restrictive alternatives would be ineffective."  *Holt*, 135 S. Ct. at 866 (citation omitted); *see also Schlemm*,

---

[12] The Warden says that despite Mr. Lindh's assertion that the Warden "did not consider any alternatives to the implementation of the visual search[, Mr. Lindh] produces no evidence to support such blatant speculation on his part." [Filing No. 70 at 18.]  The Court reminds the Warden that he bears the burden at this stage to show that the challenged policy is the least restrictive means of serving the compelling government interest at issue.  *Holt*, 135 S. Ct. at 863 (citing 42 U.S.C. § 2000cc-1(a)).  Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Johnson*, 325 F.3d at 901.  Because the Warden has produced no evidence that he considered other alternatives to Mr. Lindh's request to be exempt from visual strip searches before non-contact social visits, the Court considers it to be an undisputed fact that no alternatives were considered.

784 F.3d at 365 (the Act "requires the [prison] not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest").

After reviewing the parties' arguments and the admissible evidence, the Court concludes that the Warden has not met his burden to prove that denying Mr. Lindh an exemption from the visual strip search policy before a non-contact visit is the least restrictive means of furthering the compelling governmental interest at issue. As previously described, during a non-contact visit, an inmate remains in a different room from his visitors, physically separated by plexiglass, recorded by video, speaking over a telephone that is audio monitored and recorded, and with a correctional officer directly outside the room and able to monitor the inmate through the plexiglass door to the visiting room. Although the Warden admits that a visual strip search before a non-contact visit might be one of the CMU's "redundant security measures," it contends that it is the least restrictive means to ensure total monitoring of inmate communications during those visits. [Filing No. 69-1 at 5.] The Warden also focuses on the "human element" of the monitoring, "meaning that it is impossible to expect that observing officers are never going to look away for a moment during a visit." [Filing No. 69-1 at 5.]

Abiding by the Supreme Court's directive in *Holt* that this Court must not simply assume that a plausible, less restrictive alternative would be ineffective, the Court finds that the Warden

has failed to meet his burden on this point.[13]   As Mr. Lindh suggests, one alternative could be for

him to remove all clothing except for the underwear shorts that cover his *awrah*.  A correctional

officer could then search Mr. Lindh's clothes, and Mr. Lindh could squat and jump up and down

in the shorts to show that he is not hiding concealed paper messages or photographs.  Although the

Warden contends that this process still may not reveal all concealed communications—such as a

message written on Mr. Lindh's body under his shorts—the Warden fails to account for the inmate

uniform that Mr. Lindh would be wearing during the visit and the difficulty he would have

revealing a concealed message without detection, especially if additional security measures such

as handcuffs and/or leg irons were used to restrict his movement during the visit.  The Warden's

argument also ignores that revealing a message written on his *awrah* would require Mr. Lindh to

violate his sincerely held religious beliefs, which the Warden has not challenged in this case.

The Warden summarily rejects the effectiveness of handcuffs by pointing out that they

would make it difficult or impossible for Mr. Lindh to talk to his visitors on the phone, but the

Warden ignores feasible alternatives such as a hands-free headset, which RFRA could require the

Warden to obtain.  *See Hobby Lobby*, 134 S. Ct. at 2781 (RFRA "may in some circumstances

require the Government to expend additional funds to accommodate citizens' religious beliefs");

*see also Schlemm*, 784 F.3d at 365 ("Saving a few dollars is not a compelling interest, nor is a

---

[13] Mr. Lindh cites non-binding authority that he is entitled to summary judgment because the evidence is undisputed that the Warden "has failed in his obligation to demonstrate that 'it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.'"  [Filing No. 75 at 14 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005)).]  Because a concurring opinion in *Holt* suggests otherwise, the Court will not grant Mr. Lindh summary judgment on that basis.  *Holt*, 135 S. Ct. at 868 (Sotomayor, J.) ("nothing in the Court's opinion suggests that prison officials must refute every conceivable opinion to satisfy RLUIPA's least restrictive means requirement.  Nor does it intimate that officials must prove that they considered less restrictive alternatives at a particular point in time.  Instead, the Court correctly notes that the Department inadequately responded to the less restrictive policies that petitioner brought to the Department's attention during the course of the litigation . . . .").

bureaucratic desire to follow the prison system's rules.  The Act requires prisons to change their rules to accommodate religious practices; rules' existence is not a compelling obstacle to change.").  The Warden also ignores other feasible alternatives to achieve his desired goal of total communication monitoring, such as requiring a correctional officer to stand immediately outside the door to the visiting room during Mr. Lindh's non-contact visits so that his movements are visible at all times or installing additional security cameras to eliminate any possible blind spots in coverage monitoring.  To the extent that the Warden relies on possible security breaches related to the "human element" of monitoring, [Filing No. 69-1 at 5], he cites no authority supporting his apparent position that violations of Mr. Lindh's religious rights can be excused if the Warden's staff does not adequately perform their job responsibilities.

The Warden's arguments in support of visual strip searches being the least restrictive means exclusively focus on limited examples of possible subterfuge by inmates other than Mr. Lindh.  It is undisputed, however, that some of these inmates were not housed at the CMU and some of the incidents were unrelated to non-contact social visits.  [*See, e.g.*, Filing No. 69-1 at 5-7.]  While the examples cited by the Warden give the Court context for what inmates have attempted to do to thwart monitoring, the "exceptionally demanding" least-restrictive-means standard requires the Warden to focus on the application of challenged policy to Mr. Lindh—the person whose sincere exercise of religion is being substantially burdened.  *Holt*, 135 S. Ct. at 863; *Hobby Lobby*, 134 S. Ct. at 2780.  Mr. Lindh has been housed at the CMU since 2007 and has only had non-contact social visits with his family.  The Warden cites no evidence that Mr. Lindh has violated or attempted to violate any communications-related policies either during or outside of his non-contact visits in the nine years he has been housed at the CMU or that Mr. Lindh's family members present any type of security risk.

26

There is no question that Supreme Court precedent requires this Court to find in favor of Mr. Lindh on his RFRA claim because the Warden has not met his burden to show that the challenged policy is the least restrictive means of achieving his desired goal without imposing a substantial burden on Mr. Lindh's exercise of religion.  Accordingly, the Court grants summary judgment in favor of Mr. Lindh on his RFRA claim.

### C.  Effect of the Court's Decision

A few additional words are necessary to put the limited effect of the Court's decision into context.  First, it is again worth emphasizing that Congress passed RFRA and RLUIPA in response to United States Supreme Court decisions that Congress believed "may burden religious exercise." *Hobby Lobby*, 134 S. Ct. at 2761.  Congress designed those statutes "to provide very broad protection for religious liberty . . . [and they go] far beyond what [the Supreme Court] has held is constitutionally required." *Id.* at 2767.  As recent Supreme Court decisions confirm, these statutes protect plaintiffs pursuing valid religious liberty claims regardless of what religion they practice. *See Hobby Lobby*, 134 S. Ct. at 2751 (finding in favor of for-profit closely-held corporations with Christian owners that pursued a RFRA claim about the contraceptive mandate in the Affordable Care Act); *see also Holt*, 135 S. Ct. 853 (finding in favor of a Muslim inmate on his RLUIPA claim with regard to the prison's no-beard policy).  Ultimately, it is the Court's responsibility to enforce the statutes as written and under the standards prescribed, *Hobby Lobby*, 134 S. Ct. at 2785, while not abdicating the responsibility conferred to it by Congress to apply the statutes' rigorous standards, *Holt*, 135 S. Ct. at 864.

Second, it is important to recognize that Mr. Lindh makes an as-applied challenge to the Warden's policy of visually strip searching him before non-contact social visits.  [Filing No. 75 at 11 ("[N]owhere does the Warden focus on the policy and Mr. Lindh.  After all, Mr. Lindh is not

challenging the policy on its face.  He is simply seeking to modify the policy as applied to him because of his legitimate religious beliefs.").]  By finding in favor of Mr. Lindh on his RFRA claim, the Court has not found the Warden's visual strip search policy to be invalid with regard to any inmate other than Mr. Lindh.  Instead, after applying the rigorous RFRA standards, the Court has found that the Warden has not met his burden to justify continued visual strip searches of Mr. Lindh before non-contact social visits.  This holding does not mean that Mr. Lindh cannot be required to undergo other additional security measures that do not violate his sincerely held religious beliefs, and Mr. Lindh acknowledges as much.  [Filing No. 56-2 at 5; Filing No. 75 at 6.]

Third, while it is possible that other CMU inmates could file their own RFRA claims regarding the visual strip search policy at issue, if the Warden "suspects that an inmate is using religious activity to cloak illicit conduct, prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic."  *Holt, 135 S. Ct. at 866-67*.  Moreover, the Warden may be entitled to withdraw any accommodations made to any inmate—including Mr. Lindh—if that inmate "abuses the exemption in a manner that undermines the prison's compelling interests."  *Id.* at 867.

With these considerations in mind, the Court grants summary judgment to Mr. Lindh on his RFRA claim.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** both parties' motions for summary judgment.  [Filing No. 56; Filing No. 68.]  Specifically, the Court grants summary judgment in favor of Mr. Lindh and against the Warden on Mr. Lindh's RFRA claim and grants summary judgment in favor of the Warden and against Mr. Lindh on Mr. Lindh's Fourth Amendment claim.  Mr. Lindh seeks permanent injunctive relief for prevailing on his

RFRA claim, and the Warden does not deny that such relief is appropriate if the Court enters judgment in favor of Mr. Lindh on that claim.  The Court will issue a permanent injunction and final judgment enjoining the Warden from conducting a visual strip search of Mr. Lindh before a non-contact social visit at the CMU.  If at some point the Warden believes that the circumstances leading to this injunction have materially changed such that an accommodation for Mr. Lindh is no longer necessary, the Warden may petition the Court for a modification.

Date: 8/30/2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Electronic Distribution via CM/ECF:**

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jonathan A. Bont
UNITED STATES ATTORNEY'S OFFICE
jonathan.bont@usdoj.gov